IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CONSTRUCTION CASUALTY INSURANCE,
LLC, d/b/a CCI,
A Florida Limited Liability Company,

       Plaintiff,

vs.                                          CASE NO.

CRYSTAL CROTEAU,
An Individual, and
CRYSTAL CLEAR INSURANCE LLC,
A Florida Limited Liability Company

       Defendants.

---

## COMPLAINT

Plaintiff, CONSTRUCTION CASUALTY INSURANCE, LLC d/b/a CCI ("CCI" or "Plaintiff"), a Florida Limited Liability Company, by and through its undersigned counsel, hereby brings this Complaint against Defendants CRYSTAL CROTEAU ("Croteau"), an individual, and CRYSTAL CLEAR INSURANCE LLC ("Crystal Clear"), a Florida Limited Liability Company, and CCI, LLC., a Florida Limited Liability Company (Croteau, Crystal Clear and CCI, LLC, collectively hereinafter referred to as "Defendants") and in support thereof states as follows:

1

## NATURE OF THE ACTION

1.     This is an action for damages and for permanent injunctive relief against Defendants. The action is being brought due to Croteau's violation of the Non-Solicitation, Non-Piracy, Non-Compete, Non-Disclosure and Confidentiality Agreement dated November 12, 2021 enclosed hereto as Exhibit A (hereinafter referred to as "Agreement"), as well as Defendants acts of trade secret misappropriation, intentional interference with contractual relationships, unfair competition, trademark infringement, and Anticybersquatting Consumer Protection Act violation.

## I.     PARTIES

2.     Plaintiff is a limited liability company existing under the laws of the State of Florida with a principal place of business in St. Petersburg, Florida.

3.     On information and belief, defendant Croteau is an individual who resides at 5012 N. Falkenburg Road, Tampa, Florida 33610.

4.     Crystal Clear is a limited liability company existing under the laws of the State of Florida with a principal place of business at 5012 N. Falkenburg Road, Tampa, Florida 33610.

## II.    JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because of claims arising under the Lanham Act

(15 U.S.C. §§1051 et seq.), and pendant jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

6.     This Court has *in personam* jurisdiction as to Defendants because, upon information and belief, they are subject to both general and specific jurisdiction in this State. More particularly, upon information and belief, Defendants regularly conduct business activity and/or maintain headquarters in the State of Florida and sell and offer products and services in this judicial district.

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391(b)-(d) because, among other things, Defendants are subject to personal jurisdiction in this judicial district and have a regular and established place of business in Florida. Moreover, a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, as the injury to the Plaintiff is suffered in this district.

8.     The Agreement also has a choice of venue provision of Pinellas County, Florida, which is served by the Tampa Division of the Middle District of Florida. *See* Agreement, §4.9.

## III.   CCI'S INSURANCE AGENCY

### A. Formation of CCI

3

9.     The founder and managing member of CCI, Brad Dempton, graduated from college with a B.S Degree in Risk Management in June of 2001; He graduated at the top of the Class of 2003 held by the agency Brown & Brown. received Certified Insurance Councilor designation in 2007; served as Vice President at Brown & Brown until 2011; and served as President of Bowen, Michlette and Britt until 2015. He used his extensive knowledge of insurance, entrepreneurship and expertise in the insurance industry to become the Founder of CCI on August 7, 2015.

10.     Mr. Dempton also founded and is the CEO and Managing Member of GTFH LLC d/b/a CompCorrect and CCI Risk LLC, two companies also devoted to the worker's compensation and insurance fields.

11.     Over the past 23 years, Mr. Dempton developed substantial relationships with both prospective and current customers and has used those relationships and his entrepreneurial expertise to grow CCI to its current status.

12.     Since at least as early as 2015, CCI has provided its insurance agency services under the marks CCI and CONSTRUCTION CASUALTY INSURANCE (hereinafter referred to collectively as "CCI's Marks") to consumers throughout the United States.

13.     Since at least as early as January 1, 2016, Plaintiff has advertised and provided their services through their website which can be reached

4

through the domain name <www.cci-ins.com>. Plaintiff's email addresses all originate from this domain name, and consumers are familiar with it as belonging to Plaintiff.

14.    In connection with its services, Plaintiff filed U.S. Trademark Application Serial Nos. 97/669401 for the mark  and 97/669324 for the mark CCI, both specified for use in connection with "**consulting and information concerning insurance; insurance agency and brokerage; insurance consultancy; insurance risk management.**"

B. CCI's Substantial Relationships

15.    From the beginning, CCI made great efforts to create substantial relationships with its customers, including but not limited to: (1) employing and training agents to be knowledgeable in the industry and able to assists its customers; (2) being available for phone calls at all hours to assist with the needs of its insurance customers, (3) timely returning phone calls to its customers; (4) assisting the insured with its carrier on claims made against the **insured's workers' compensation policy, general liability policies, commercial** liability policy and automobile policies; and (5) continuously providing the highest quality of products and services at the most competitive prices in the insurance market. These aforementioned efforts have resulted in garnering

relationships with customers who have continued to return to CCI over the years for their various insurance needs.

16.    Many of CCI's customers return not only because of these efforts but also for new products as well as **daily assistance with their workers'** compensation claims and questions of agents regarding changes in the insurance markets, impact on insurance due to hurricanes, price hikes, issues with reinsurance markets, availability of products, experience modifications, reasons for price and rate increases, and status of claims either made by the customer or claims made against the customer. CCI's **customers** rely on CCI to report all claims to the affected insurance carriers which is tracked in its specialized database system provided by GTFH LLC.

17.    CCI also relies heavily on referrals from its existing, prior, and prospective customers as well as other industry insiders such as: (1) insurance carrier personnel; (2) business organization; (3) other companies who have an incentive to assist potential insureds with their insurance needs; (4) nonprofit organizations to which CCI contributes; and (5) individuals in the political arena who have their fingers on the pulse of the insurance industry. Each of these industry insiders consistently refers customers to CCI.

18.    The substantial relationships CCI and its subsidiaries have developed and maintains with many of its customers have formed the backbone of CCI from a profitability standpoint. Many of these customers have brought

revenue to CCI of more than One Hundred Thousand U.S. Dollars ($100,000.00) each over the course of their relationships with CCI.

19.    CCI caters to broad categories of customers, including but not limited to those in the: (1) construction industry, (2) transportation industry, and (3) other businesses needing workers compensation, employer liability, **cyber insurance, contractors' pollution liability insurance, builders' risk** insurance, commercial general liability, automobile liability, umbrella and excess liability, and contractors professional liability, and homeowners; and (4) businesses **who need assistance with their day to day workers' compensation** claims.

20.    CCI has focused its experience and marketing towards the construction and trucking industries, staffing organizations, and Professional Employee Organizations (PEO), and has developed deep ties with these industries.

21.    CCI competes with many other insurance agencies throughout Florida for customers nationwide for Florida-based businesses, properties, and assets, but most fiercely competes with other companies located in the Tampa Bay area and specifically the construction and trucking industry. Competition within the insurance industry is fierce and is highly sensitive to price, quality, and level of service provided.

22.    Of the broad categories of customers identified, *supra*, much of CCI's business comes from existing customers with whom CCI and its founder has established and maintains substantial relationships which have taken years to develop.

23.    These relationships are developed and maintained most closely by CCI's **insurance agents who** have the authority to negotiate pricing due to the availability of various insurance carriers to choose from and the ability to determine the best market for the customer.

24.    Because CCI's **insurance agents** such as Croteau are most closely responsible for **maintaining CCI'S substantial relationships with its** customers and referral sources, CCI's **insurance agents are required to** execute agreements with CCI that contain certain restrictive covenants to **protect CCI's legitimate interests in its customers** and referral sources.

C.  <u>CCI's Confidential Information and Trade Secrets</u>

25.    Since its inception, CCI has spent a substantial amount of time and money in acquiring and developing its confidential and proprietary information and trade secrets, including but not limited to: (1) confidential plans for future clients, carriers, self-insured employers, and professional employee organizations; (2) confidential customer information including customer lists, contact information, and sales history and volume; (3) pricing

data and strategies; (4) marketing data and strategies; (5) employee compensation schedules; (6) individual product margin limits; (7) analytics including sales volume and performance; (8) maintenance schedules; and (9) referrer information.

26.   CCI takes reasonable measures protect its trade secrets and confidential information, which derives independent economic value from not being known by the general public. CCI reveals such information to its employees only on a need-to-know basis, and otherwise pursues a variety of precautions to prevent disclosure of its proprietary information to its competitors that is reasonable under the circumstances.

27.   CCI keeps much of its confidential information and trade secrets in its point of sale system which is password protected. Each user has a unique password which allows access to only certain parts of the system. However, users of the system do have the ability to run customizable search queries in order to generate reports which include user defined outputs.

28.   For instance, a user can create reports that depict: (1) all customers within a specific zip code; (2) all customers who have spent more than a specific dollar amount; (3) all customers who have returned at least a specific number of times; or (4) all products above a specific profit margin.

29.   In addition to the trade secrets and confidential information

housed in the point of sale system, CCI also reveals its confidential information to its insurance agents during its weekly managers meetings for which attendance is required. **CCI's insurance agents thus have weekly sessions which drill home CCI's margin limits**, company performance, company performance goals, and  marketing and referral strategies amongst other things.

30.    At these meetings, not only is information revealed, but the insurance agents are instrumental in: (1) developing margin limits for new products; (2) assessing and, at times, changing margin limits for existing products; (3) analyzing the insurance market and setting new goals for specific products; (4) analyzing the outside market and identifying and analyzing opportunities for new insurance products; listening to other more experienced insurance agents detail their sales plan and discuss potential customers that they are seeking to bring in as a customer; and (5) assessing **and, at times, changing agents' commissions in the marketplace.**

31.    Because **CCI's employees have access to far more of CCI's confidential information, CCI's employees, including** Croteau, are required to execute agreements containing restrictive covenants. These covenants **provide an additional layer of protection for CCI's** trade secrets and confidential information.

## IV.   DEFENDANTS' UNFAIR COMPETITION

### A.  Plaintiff's Specialized Training of Croteau

32.    Prior to her professional relationship with CCI, Croteau had no experience in the insurance industry. Croteau did not have any clients, contacts, or any institutional knowledge in the insurance industry.

33.    Prior to becoming an employee of CCI, CCI agreed to pay for fees, books, and materials for Croteau to study and pass the insurance agent's exam so that she could be able to work for CCI.

34.    Croteau first became employed by Plaintiff on or about November 29, 2019, three days after she passed her insurance agent exams. Shortly thereafter, on or about January 27, 2020, Croteau executed a confidentiality and non-compete agreement with Plaintiff (the "First Agreement").

35.    On or about November 12, 2021, Croteau executed the Agreement, which superseded and replaced the First Agreement, in exchange for continued employment and continuing commissions in addition to a salary.

36.    CCI expended considerable resources and provided substantial, extraordinary and specialized insurance training to Croteau both before and after her hiring. The great expense which CCI has undertaken in order to provide specialized training to its employees, Croteau included, provides CCI

11

with a competitive advantage.

37.    Croteau was trained as to how to operate as an insurance agent pursuant to the rules, regulations, and statutes that govern insurance agents, and was put through countless in-house training program. These training programs included: (1) sales closing training; (2) employee management training; (3) financial management training; (4) various areas of insurance that CCI focused on; and (5) specialized training for specific insurance products and services; (6) training on the rules and statutes relating to selling of insurance; (7) Rules of Underwriting; and (8) understanding National Council on Compensation Insurance (NCCI) and Department of Financial Services, State of Florida (DFS) and Office of Insurance Regulation (OIR).

38.    Croteau was present during the times that CCI conducted weekly marketing meetings with its insurance agents as discussed above wherein she was privy to all of that information as well as: (1) historical financial information such as profit margins and volume sales; (2) margin guides for insurance products, which information is used to implement the company's established negotiation terms by product; (3) goals and benchmarks regarding sales by category and time of year; (4) effective past marketing strategies and plans for future marketing; (5) plans and the reasoning for discontinuing certain insurance products and/or bringing on

other lines of insurance; (6) customers, prospective and targeted customer markets; (7) customer information; (8) contractors; (9) referral sources; (10) targeted potential referral sources; (11) sales and marketing strategies and techniques; (12) general operations; (13) business strategies; (14) financial statements and other financial information and matters, budgets; (15) investments; (16) proprietary information; (17) revenue and profitability; (18) fees; (19) products and service; (20) other trade secrets associated with CCI and its businesses; and (21) agents' **individual** performance and the prevalent market forces in order to set benchmarks for future sales of insurance.

39.    As an insurance agent, Croteau was given full access to all of CCI's **sales system** discussed above, which contains the vast majority of its confidential **information, which revolved around:** (1) setting insurance agents' commissions; (2) setting margin limits for particular products; (3) establishing product benchmarks; (4) developing and maintaining company manuals including the employee handbook, training material, policies and **procedures manual and guides, etc.; and (5) developing CCI's marketing and** outreach strategies.

40.    Croteau was also exposed to a unique artificial intelligence system on behalf of its clients discussed above, which is operated throughout Florida and several other states. This system is not available from any other

13

source but CCI and contains significant confidential and proprietary information that derives inherent economic value from not being public.

41.    In addition to CCI's trade secret and confidential information, Croteau's tenure with CCI enabled her to develop relationships with customers or organizations and insurance carriers with whom CCI maintains substantial relationships.

42.    In view of the foregoing, Croteau had access to all of CCI's customer, client, and referral relationships, trade secrets, confidential information, and specialized training. Croteau maintained certain of these relationships on behalf of CCI while employed at CCI and had access to information regarding other substantial customer relationships that she did not maintain on behalf of CCI. Croteau had access to, and the ability to download, print, and retain either in hardcopy form or in her memory, of CCI's customer lists, which is not readily obtainable from any source other than from CCI. With this information, Croteau can compete to CCI's competitive disadvantage, and has shown every indication that she is doing so and intends to continue to do so.

B. <u>Croteau's Breach of the Agreement and Defendants' Unfair Competition</u>

43.    Croteau voluntarily left her employment with CCI on or about October 18, 2022.

44.    On or about September 15, 2022, after almost three years of being employed and trained by CCI, but before she left her employment, Croteau created Crystal Clear to provide insurance-related products and services in violation of the Agreement.

45.    Defendants are direct competitors of CCI, providing insurance agency services and providing software that allows people to compare insurance policies.

46.    On or about November 29, 2022, Defendants registered the domain name <ccinsurancellc.com> (the "Domain Name") in bad faith to attempt to trade off Plaintiff's trademark rights and goodwill as well as confuse consumers as to their affiliation with Plaintiff.

47.    The Domain Name is confusingly similar to both Plaintiff's CCI mark and Plaintiff's domain name <https://cci-ins.com>, which Plaintiff uses for its e-mail addresses and redirects to its website.

48.    Upon information and belief, Defendants attempted to use the Domain Name and CCI's' CCI mark as well as variations thereof (collectively referred to herein as the "Infringing Marks") to confuse customers, clients, and insurance carriers into believing that Defendants were affiliated with Plaintiff.

49.    Upon information and belief, Croteau is using CCI's confidential

and trade secret information to unfairly compete with CCI and to attempt to interfere with CCI's substantial and actual relationships with clients, customers, insurance agencies, and referral sources.

50.    Upon information and belief, Croteau is also engaging in a similar business within a fifteen (15) mile radius from CCI, as she is providing insurance agency services to customers within fifteen (15) miles of Plaintiff.

51.    Upon information and belief, Croteau has reached out to numerous current, prospective, and old CCI customers in an effort to solicit and place insurance. As an example, numerous of customers of CCI that were placed by Croteau while an employee of CCI have advised CCI that they are not sure if they want to renew their current policies and have requested their loss runs to be taken to other carriers to renew the current policies.

52.    Croteau has violated the confidentiality provision of the Agreement by using CCI's confidential information and trade secrets for her own benefit and for the benefit of Crystal Clear. Upon information and belief, Croteau has retained knowledge of CCI's margin limits and inevitably uses this information when negotiating with customers.

53.    On or about October 14, 2022, Croteau contacted James Weir with Paylocity to set up a plan to help companies she had access to while with CCI to assist companies to get off leasing plans and into the standard market.

16

Croteau requested of a prospect that she had access to while at CCI to forward loss runs to enable Croteau the ability to remove the prospect from a PEO by issuing an insurance policy to the standard market. *See* Exhibit B (Email re Paylocity meeting dated October 14, 2022).

54.    Upon information and belief, Croteau attempted to write or actually wrote a policy for the employer and/or other employers after she left CCI using the prospect list from Paylocity which she gained while employed by CCI.

55.    On or about January 12, 2023, Defendants also used the email address <crystal@ccinsurancellc.com> to request a "log-in" to CCI's portal with a large insurance carrier for the purpose to "review, quote and service all agency policies." These accounts amount to millions of dollars CCI of policies placed on behalf of numerous customers, which Defendants were attempting to gain access to by using a confusingly similar domain name and Croteau's old connections with the insurance carrier. Fortunately, the ruse was discovered in time and the access was denied, but the insurance carrier was confused and believed the request to be legitimate.

56.    Upon information and belief, Croteau continues to use that prospects list that belongs to CCI and is confidential to pull employers from PEOs to issue policies to move these employees to the standard market.

57.    On information and belief, Croteau is interacting with current, prospective, and old CCI customers **in an insurance agent's sales capacity.** As part of such interaction, Croteau is quoting prices on insurance policies to CCI's current, prospective, and old CCI customers. **Croteau's quotes to CCI's** current, prospective, and old customers is inevitably informed by – and therefore inevitably using and disclosing – CCI's **confidential margin limits** which Croteau has retained in her memory or documents.

58.    **Upon information and belief, Croteau reached out to one of CCI's** providers Berkshire-Hathaway, a company that she was familiar with and introduced to while employed by CCI. She requested an appointment to write policies for it.

59.    Upon information and belief on or about January 25, 2023, Croteau went head to head with a Partner of CCI, Tobin Robeck, to sell a policy to an insured that was a customer of CCI and for which CCI was the agent of record.

60.    The only way that Croteau would have the information that the **policy was up for renewal is that she has in her possession CCI's list of** prospective, current and old customers of CCI or she took with her the list of insureds that she sold policies to while employed by CCI.

61.    **Upon information and belief Croteau's LinkedIn page still list her**

as employed with CCI as of February 2, 2023. This causes the confusion in the market place making the users of LinkedIn believe she is still employed by CCI.

62.    Upon information and belief Croteau still has on her Facebook page advertisement on how to save money "with our exclusive roofing program". The problem with that advertisement is that it shows that she is still with CCI. Yet another ruse to continue to confuse the public as to her connection with CCI so that she can find ways to sell to CCI's customers, many of whom she met while employed at CCI.

63.    Croteau's contacting, using, misleading and selling to CCI's customers constitutes a threatened breach of the confidentiality covenant for which Croteau agreed injunctive relief was the appropriate remedy. *See* Agreement, §4.4.

64.    Plaintiff wrote a letter to Croteau on or about October 21, 2022 to remind her of her obligations to no avail. Defendants have insisted on continuing their unfair competition.

65.    At least three emails have been sent to Croteau's email address that she registered with the Department of Insurance Licensing Bureau and the email address she is using as her current business email address to ask her to cease and desist from her activities which are spelled out in each email

19

in that she was violating her Agreement with CCI.

66.    She has not responded and continue to work to remove policies from CCI in direct competition with it.

67.    All conditions precedent to bring this action have occurred have been waived; or, have otherwise been satisfied.

## FIRST CAUSE OF ACTION
## THEFT OF TRADE SECRETS AGAINST DEFENDANTS
## PURSUANT TO § 688.002 FLA. STAT.

68.    Plaintiff reincorporates and realleges the allegations set forth above as if fully set forth herein.

69.    While working for CCI, Croteau had access to CCI's trade secrets, including but not limited to: 1) confidential plans for future clients, carriers, self-insured employers, professional employee organizations; (2) confidential customer information including customer lists, contact information, and sales history and volume; (3) pricing data and strategies; (4) marketing data and strategies; (5) employee compensation schedules; (6) individual product margin limits; (7) analytics including sales volume and performance; (8) maintenance schedules; and (9) referrer information.

70.    CCI's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily

ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

71.    CCI's trade secrets are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.    Such efforts include having employees sign non-disclosure agreements such as those contained in the Agreement.

72.    Defendants acquired CCI's trade secrets through improper means, namely, Croteau's breach of a duty to maintain secrecy. The Agreement specifically prohibited Croteau from, among other actions, disclosing any of CCI's trade secrets or confidential information of any kind concerning any matters affecting or relating to the business of CCI.

73.    Defendants further acquired CCI's trade secrets under circumstances giving rise to a duty to maintain its secrecy or limit its use. Specifically, Croteau acquired CCI's trade secrets while working at CCI, and Crystal Clear knew this since it was formed and operated by Croteau. Defendants knew that CCI considered its information trade secrets, particularly because the Agreement specifically referenced trade secrets and provided provisions for their non-disclosure.

74.    On information and belief, Defendants misappropriated CCI's trade secrets by using them to establish a competing business, soliciting CCI's

customers and referral sources from CCI's lists, and by attempting to lure away CCI's customers by using trade secret information, such as their historical sales information.

75. Plaintiff is suffering and will continue to suffer damage irreparable injury from Defendants' continued misappropriation of CCI's trade secrets. CCI has no adequate remedy at law in the present circumstances.

76. Plaintiff has a substantial probability of success on the merits of the claim asserted herein, which is attended by Defendants' intentional effort to unlawfully harm Plaintiff's business through a pattern and practice of unfair competition.

## SECOND CAUSE OF ACTION

### VIOLATIONS OF THE AGREEMENT
### AS TO CROTEAU)

77. Plaintiff reincorporates and realleges the allegations set forth above as if fully set forth herein.

78. This is an action for damages and permanent injunctive relief against Croteau for her breach of the Agreement.

79. Croteau entered into the Agreement with CCI that contained certain restrictive covenants and agreements not to disclose CCI's confidential and trade secret information.

22

80.    The Agreement at Section 2.1 states:

2.1 ACCESS – Employee will have access to one or more of the following assets listed above of the Company; including but not limited to: (a) trade secrets; (b) valuable confidential business or professional information; (c) prospective or existing clients, customers, and franchisees, referral sources and investors and other business associates of Company; (d) the goodwill of Company clients, customers, franchisees, employees, contractors, referral sources and investors and other business associates (which are all referred to as "**Business Associates**"); (e) extraordinary or specialized training or education; and (f) other Confidential Information (defined below).

81.    As a material inducement to the Company to enter into the Agreement, Sections 2.2 and 2.7(c) provide that, during her employment and for a period of two years after termination thereof (the "**Prohibition Period**"), Croteau:

will not directly or indirectly, either as an individual or as a shareholder, director, member, manager, officer, employee, partner, proprietor, joint venture, trustee, beneficiary, advisor, employee, agent, lender, guarantor, independent contractor, consultant, or otherwise:

(a) have any interest in any Entity (including but not limited to any equity interest; option, right of first offer, right of first refusal, or other right to acquire or convert into any equity interest; participation right, or phantom stock of equity right) or receive any compensation of any kind from any Entity, which is engaged in a Competitive Business (except as a shareholder holding less than 1% of the aggregate number of issued and outstanding shares of the publicly traded corporation); or

(b) provide financial or other assistance, guaranty any loan or debt, or act as an agent of, consultant for, or

23

advisor to, any Entity which is or is about to become engaged in a Competitive Business in the Restricted Territory.

82.    The term "Competitive Business" is defined in Section 2.3(c) as "the business of being a company that provides services based on artificial intelligence to assist its clients in overseeing its workers compensation claims, reducing financial exposure, and streamlining the in-house handling of claims for the client companies; or, in the business of selling insurance to customers."

2.    Likewise, under Section 2.3, Croteau agreed that:

During the Prohibition Period, Employee will not directly or indirectly, either as an individual or as a shareholder, director, member, manager, officer, employee, partner, proprietor, joint venture, trustee, beneficiary, advisor, employee, agent, lender, guarantor, independent contractor, consultant, or otherwise:

(e) solicit to provide or provide any of Company's customers or any of Company's prospective customers with any product or services, or

. . .

(g) will not disclose customer lists, or

(h) will not participate either directly or indirectly in the solicitation of existing Company customers, or

(i) will refrain from carrying on or engaging in a similar business within a fifteen (15) mile radius of the Company, or

(j) will refrain from soliciting old customers.

83.    The Agreement at Section 3.1 provides:

24

**SAFEGUARD AND NON-DISCLOSURE.** Employee agrees that from the Effective Date and for all time thereafter, Employee will hold in confidence, safeguard and will not, directly or indirectly, disclose or authorize anyone to disclose any Confidential Information. Without limiting the generality of the foregoing, Employee agrees that Employee will regard and treat each item of information or data constituting Confidential Information as strictly confidential, and that it will not, for any reason or in any manner, either directly or indirectly, use, analyze, sell, lend, lease, distribute, license, give, transfer, assign, show, disclose, disseminate, reproduce, copy, appropriate, or otherwise communicate any such item of information or data to any person or entity for any purpose. Employee will immediately notify Company of any unauthorized disclosure or use, whether intended or unintended, of any Confidential Information by Employee or by any other person or Entity of which Employee.

84.     The Agreement then defines the Company's Confidential

Information in Section 3.2 as:

**DEFINITION OF CONFIDENTIAL INFORMATION.** For the purposes of this Agreement, the term "Confidential Information" will include, without limitation, all proprietary data and information, trade secrets, and all other confidential information regarding Company, regardless of when such information was obtained or received, including, without limitation, confidential information regarding products, services, future products and services, recipes, technologies, processes, techniques, methodologies, methods of operations, developments, marketing plans and information, know-how, trade secrets, business plans, strategies, capabilities, proprietary intellectual knowledge, procedures and methods of business development, assets, liabilities, financial statements and other financial information, projections, forecasts, tax returns, customer lists and supplier information. Confidential Information shall also include, without

limitation, any information, or data (a) which is designated (whether orally or in writing) as "confidential," "proprietary," or with another similar designation; or (b) which Employee knows or has reason to know is Confidential Information.

85.    In exchange for agreeing to these restrictions and actions, Croteau continued to be gainfully employed.

86.    The restrictive covenants are necessary, reasonable, and supported by adequate consideration, as well as supported by legitimate business interests.

87.    Plaintiff's legitimate business interests include but are not limited to: trade secrets; valuable confidential business and professional information; customer, referral, and insurance agency goodwill; an ongoing business practice by way of Plaintiff's Marks; a specific geographic location; specific trade area; and extraordinary and specialized training as set forth herein.

88.    The non-compete provision restricts Croteau from: (1) having an interest in any Entity or receiving compensation from any Entity engaged in Competitive Business; (2) providing financial or other assistance, guaranty any loan or debt, or act as an agent of, consultant for, or advisor to, any Entity which is or is about to become engaged in a Competitive Business in the Restricted Territory; and (3) personally carrying on or engaging in a similar business within a fifteen (15) mile radius of Plaintiff.

89.     The non-solicitation provisions restrict Croteau from soliciting to provide any of CCI's customers or prospective customers with any products or services, not to solicit CCI current or old costumers. *See* Agreement, §2.2(e), (h), and (j).

90.     The confidentiality provision of the Agreement restricts Croteau from divulging or using any of CCI's confidential information and trade secrets.

91.     Upon information and belief, Croteau breached each of these provisions multiple times. The continued confidentiality of the entirety of Plaintiff's confidential information is threatened by Croteau's conduct.

92.     But for Croteau's employment with CCI's and for her having held the position of Insurance Agent for CCI, Croteau would not have gained personal knowledge of the abilities, work ethic, and other demonstrable strengths of CCI's employees. Croteau is now using this information gained as a result of her employment with CCI to the detriment of CCI.

93.     Due to Croteau's conduct, Plaintiff has been damaged in an amount not yet known and retained the services of undersigned counsel to represent its interests in this action.

94.     Under the terms of the Agreement, Croteau agreed that in the event of a breach of the covenants in the Agreement, proof of damages would be extremely difficult and CCI would be entitled "to injunctions, both preliminary and final enjoining and restraining such breach or threatened

breach and such remedies shall be in addition to all other remedies which may be unavailable to Company, either at law or in equity." *See* Agreement, §4.4.

95.    Plaintiff is entitled to an award of attorney's fees pursuant to Section 542.335 Florida Statutes as well as pursuant to the Agreement, which further provides for costs and expenses to the prevailing party. *See* Agreement, §4.5.

**THIRD CAUSE OF ACTION**

**TORTIOUS INTEFERENCE WITH CONTRACTUAL RELATIONSHIP AGAINST CRYSTAL CLEAR**

96.    Plaintiff reincorporates and realleges the allegations set forth above as if fully set forth herein.

97.    Crystal Clear has intentionally, unilaterally, and unjustifiably interfered with Plaintiff's contractual relationship with Croteau.

98.    Croteau was in a contractual relationship with Crystal Clear that required her not to compete with Plaintiff or solicit Plaintiff's customers, nor disclose or use Plaintiff's confidential information and trade secrets.

99.    Crystal Clear knew about the Agreement and intentionally and unjustly interfered with or otherwise disrupted this contractual relationship by assisting and causing Croteau to violate the Agreement as set forth above.

100.    As a direct and proximate result of Crystal Clear's conduct, Plaintiff has suffered, and will continue to suffer, significant economic loss and damage.

### FOURTH CAUSE OF ACTION

### TORTIOUS INTEFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS AGAINST DEFENDANTS

101.    Plaintiff reincorporates and realleges the allegations set forth above as if fully set forth herein.

102.    Defendants have intentionally, unilaterally, and unjustifiably interfered with Plaintiff's prospective, potential, and actual clients. Defendants have used sensitive information obtained from Plaintiff to unfairly bid, unfairly negotiate, and improperly solicit potential work away from Plaintiff.

103.    Defendants have intentionally, unilaterally, and unjustifiably interfered with Plaintiff's business relationships with potential and actual customers.

104.    As a result of the aforementioned conduct, Plaintiff has suffered and will likely continue to suffer loss of certain customers.

105.    Defendants' behavior was, and is, intentional, malicious, purposeful, and calculated solely and exclusively to cause Plaintiff to suffer economic loss.

106.   As a direct and proximate result of **Defendants'** conduct, Plaintiff has suffered, and will continue to suffer, significant economic loss and damage and irreparable harm.

## FIFTH CAUSE OF ACTION

## COMMON LAW TRADEMARK INFRINGEMENT

107.   Plaintiff reincorporates and realleges the allegations set forth above as if fully set forth herein.

108.   By virtue of its long-term use and promotion, Plaintiff established **valuable goodwill and, where necessary, secondary meaning in Plaintiff's** Marks well-**prior to Defendants'** use of the Infringing Marks.

109.   **Croteau has the right and ability to control the infringing activities of Crystal Clear and has a direct financial interest in Crystal Clear's activities. Croteau is the only member of Crystal Clear. Thus, Croteau is vicariously liable for Crystal Clear's infringing activities detailed herein.**

110.   Defendants are using in commerce identical and confusingly similar marks to those owned by Plaintiff in the sale of identical or related products and services to those offered by Plaintiff. Upon information and belief, Defendants have used the Infringing Marks in the provision of their insurance services.

111.   **Defendants' adoption and use of the Infringing Marks** are likely to deceive, confuse, and mislead purchasers and prospective purchasers into

30

believing that Defendants' products and services emanate from, are authorized by, and/or are in some manner affiliated with or endorsed by Plaintiff.

112.   Plaintiff has suffered injury by reason of Defendants' infringing activities, and Plaintiff is likely to suffer irreparable harm unless Defendants' infringing activities are permanently enjoined.

113.   Upon information and belief, Defendants' conduct as outlined herein was in willful disregard for Plaintiff's rights so as to justify an award of punitive damages.

114.   Defendants' activities in adopting and/or continuing to use the Infringing Marks, especially after notification by Plaintiff, is malicious, fraudulent, deliberate, and willful.

115.   Plaintiff has been damaged by Defendants' infringing uses as described above, and, unless enjoined by the Court, Defendants' infringing activities will continue to cause harm to Plaintiff.

## SIXTH CAUSE OF ACTION

## UNFAIR COMPETITION UNDER 15 U.S.C. §1125(a)

116.   Plaintiff reincorporates and realleges the allegations set forth above as if fully set forth herein.

117.   Defendants' aforesaid activities constitute unfair competition and trademark infringement in violation of 15 U.S.C. §1125(a).

118. Defendants have engaged in deceptive conduct and continue to do so by seeking to interfere with relationships between Plaintiff and its customers.

119. Defendants' actions are contrary to honest practice in industrial or commercial matters.

120. Defendants' acts of unfair competition constitute knowing and intentional trading on and misappropriation of Plaintiff's products, services, goodwill, and business reputation for Defendants' enrichment.

121. Plaintiff has suffered monetary damages as a result of Defendants' actions and is entitled to a disgorgement of Defendants' profits.

122. Plaintiff has no adequate remedy at law, as these acts of infringement and unfair competition have caused, and unless enjoined, will continue to cause Plaintiff irreparable harm that cannot be fully compensated by monetary damages.

123. The reputational damage suffered by Plaintiff is not easily or fully compensated by monetary damages.

124. Plaintiff is entitled to injunctive relief against Defendants, as well as all other monetary remedies available, including but not limited to compensatory damages, enhanced damages, disgorgement of profits, costs and attorneys' fees.

## SEVENTH CAUSE OF ACTION

## UNFAIR COMPETITION UNDER FLORIDA COMMON LAW

125.   Plaintiff reincorporates and realleges the allegations set forth above as if fully set forth herein.

126.   Defendants' aforesaid activities constitute unfair competition in violation of Florida common law.

127.   Defendants have engaged in deceptive conduct and continues to do so by seeking to interfere with relationships between Plaintiff and its customers, vendors, and referral sources.

128.   Defendants' actions are contrary to honest practice in industrial or commercial matters.

129.   Defendants' acts of unfair competition constitute knowing and intentional trading on and misappropriation of Plaintiff's products, services, goodwill, and business reputation for Defendants' enrichment.

130.   Plaintiff has suffered monetary damages as a result of Defendants' actions and is entitled to a disgorgement of Defendants' profits.

131.   Plaintiff has no adequate remedy at law, as these acts of unfair competition have caused, and unless enjoined, will continue to cause Plaintiff irreparable harm that cannot be fully compensated by monetary damages.

132.   The reputational damage suffered by Plaintiff is not easily or fully compensated by monetary damages.

133.    Plaintiff requests injunctive relief against Defendants, as well as all other monetary remedies available, including but not limited to compensatory damages, enhanced damages, disgorgement of profits, costs and attorneys' fees.

### EIGHTH CAUSE OF ACTION

### ANTI-CYBERSQUATTING CONSUMER PROTECTION ACT UNDER 15 U.S.C. §1125(d)

134.    Plaintiff reincorporates and realleges the allegations set forth above as if fully set forth herein.

135.    Defendants have registered, are trafficking in, using, and maintaining Internet domain names that are identical and confusingly similar to Plaintiff's Marks, including but not limited to the Domain Name, with the bad faith intent to profit from the goodwill associated with those marks. Defendants lack right or legitimate interests in the Domain Name.

136.    Plaintiff adopted Plaintiff's Marks long before Defendants registered and/or used the Domain Name.

137.    The Domain Name is confusingly similar to Plaintiff's Marks. Any differences are insufficient to distinguish the Domain Name from Plaintiff's Marks.

138.    Defendants have adopted the Domain Name with the intent to divert customers from Plaintiff's website for commercial gain.

34

139.  Plaintiff has been harmed by Defendants' conduct as alleged above in an amount not yet known.

**WHEREFORE**, in addition to the foregoing, Plaintiff requests that this Court enter judgment as follows:

a.  Permanently enjoining Croteau from violating the terms of the Agreement, including but not limited to: by directly or indirectly competing with CCI; using or disclosing CCI's confidential and proprietary information and trade secrets; and directly or indirectly soliciting customers or potential customers of CCI; and using Crystal Clear to pursue existing business of CCI.

b.  Permanently enjoining Crystal Clear from further acts of tortious interference with contractual relationships.

c.  Permanently enjoining Defendants from further acts of tortious interference with advantageous business relationships.

d.  Requiring Croteau to return all documents or materials containing CCI's confidential and proprietary information and trade secrets.

e.  Requiring Defendants, and all of their respective agents,

officers, employees, representatives, successors, assigns, attorneys, and all other persons acting for, with, by, through, and/or under authority from Defendants, or in concert or participation with Defendants, be enjoined permanently by this Court, from:

i.    using any trademark, service mark, name, logo, domain name, social media name, design and/or source designation of any kind in connection with Defendants' goods or services that is a copy, reproduction, colorable imitation, or simulation of, or is confusingly similar in any way, to Plaintiff's Marks;

ii.    using any trademark, service mark, name, logo, domain name, social media name, design and/or source designation of any kind in connection with Defendants' goods or services that is likely to cause confusion, mistake, deception, or public misunderstanding that such goods or services are sponsored or authorized by Plaintiff; and

iii.    passing off, palming off, or assisting in the passing off or palming off of Defendants' goods or services as those of Plaintiff, or otherwise continuing any and all such acts of unfair competition as alleged in this action.

36

f.  Award Plaintiff all damages caused by the acts forming the basis of this action, including not limited to compensatory damages to put Plaintiff in as good a position as it would have been had Croteau not breached her Agreement and which naturally result from the breach.

g.  Awarding Plaintiff compensation for corrective advertising for the damage to Plaintiff's goodwill.

h.  Requiring Defendants to pay to Plaintiff the costs of this action and Plaintiff's reasonable attorneys' fees, pursuant to 15 U.S.C. § 1117(a).

i.  Awarding Plaintiff awarded punitive damages based on Defendants' willful and deliberate infringement of Plaintiff's Marks and the other acts of unfair competition and alleged harm, and to deter such conduct in the future.

j.  Requiring Defendants to pay prejudgment interest on all damages and profits awards.

k.  Transferring the Domain Name to Plaintiff.

l.  Such other and further relief as this Court deems just and

proper.

Respectfully submitted.

Mary Ann Stiles
Mary Ann Stiles, P. A.
6250 Kipps Colony Court
Unit 106
Gulfport, Florida 33707
Phone No. 727 916 2785
Fax No. 1-727-273-9498
Florida Bar No. 258008
Attorney for Plaintiff